Good morning, Your Honor. Sun Chen, representing appellant Zte Electronics. In this case, we ask the court to review the bankruptcy ruling on our request to ask the Bankruptcy Court to declare the debt listed on the debtor's schedule in the sum of $167,000 to be non-dischargeable based on two sections of the Bankruptcy Code. The first section is 523A2A, which means it's a misrepresentation or fraud. The second section is 523A6, which means a malicious injury of the properties of the creditor. This case falls into a category of cases where debtor used his business or corporation to perpetrate the conduct. Debtor is a very sophisticated individual. He can turn $5,500 investment into a $30 million corporation at one time, but in the end, the company collapsed. On his schedule, he also listed $200,000 of loan from the corporation, which he never paid back. And that amount of loan, based on the documents we have, is mostly from the money owed to my client. The way he did it, he obtained this type of arrangement. This is based on two faults, because the arrangement between his corporation, AudioWood, and my client, Zte, is for us to deliver electronic products, the audio, the speakers. And the payment terms is COD, which means when the container show up on the loading dock, they're supposed to give us a cashier's check, or at least a check for the payment. So credit is not an issue. That went on a little while, but until the beginning of January, beginning of year 2001, the AudioWood basically has two parts of products. One part is with Mitsubishi. Apparently, they become an original equipment manufacturer to manufacture products under Mitsubishi's license or name. And the second part, he called it, is the home entertainment products, which is typically using the speakers that we supplied, try to resell to somebody else, either with some add-on, or may even resell directly. So when Mitsubishi pulled the plug, he had payment problems. He made a representation to a representative of my client, said that, we're going to pay you just wait a few days, because they have a payment history in the past. But the debtor went to see a bankruptcy or insolvency counsel, Mr. Marshak, and at that time, it's very clear to him, his company is totally hopeless, because Mr. Marshak told him, even if your company wipe out all the debts, the company could not be profitable. That's somewhere around March 2001. But instead of canceling the order he had with my client, what he did is, he called the company to issue another very large purchase order in the sum of $200,000, and asking my client to deliver one container of products every month. And in the end, if we look at the schedule of non-payments, which is on page 72, most of the debts occurred from that, after that purchase order was issued, which means after delivery, then they did not pay. Then the company still dragged on for a little while until September. That's when the last payment stopped. In the end, like I just repeated, he got $20,000 from the corporation, and mostly it's from the year around 2001, because his prior year's loan from the company is only like about $80,000 or so. So in this case, we studied a case which is called Griffin v. Felton. It is a district court case, and based on my research, I haven't found a case in this court either approved or even disapproved that case. That case basically stands for the proposition is the representation, we need to review it as a whole, not just necessarily a single, specific representation. In a case like this, I think it's better because he owned this company, so he can use the company as a sword, try to commit those acts. But in the end, when he eventually filed bankruptcy, he's using the company as a shield. He said, no, this company conduct, not my conduct. What do we do with the we've got a finding of the bankruptcy court, and it was affirmed, I think, by the bankruptcy appellate panel, that no representation had been made, that there simply were no representations made by the audio or its president to your client. Okay, first of all, my recollection of bankruptcy court's finding, there's no really finding of fact on whether there is or there's no representation. I believe there's a conclusion. But there was representation on record between the debtor and my client's representative discussing the payments. Right in our understanding, it's representation in a context of debtor's knowledge that his company cannot possibly pay, that he's making promise of payments in order to get more delivery. I believe those representations is on page 258, 262, and 266 on the excess of records. And also- But the bankruptcy court did make the finding that Amoroso never made any specific representations to any representatives of plaintiff regarding products, audio, wood products, or audio, Yeah, it seems to me that sounds more like a legal conclusion, because the bankruptcy court did not address whether those representations I just mentioned is representation, is false or non-false. And also, the bankruptcy court did not address the issue of that last purchase order, which in my opinion is very significant, because that's the form of misrepresentation, because that purchase order not only is huge, also it is COD, which the debtor clearly knows that they have no ability to pay on COD terms at that time. But the reason I mention that, the other case, Griffin's case- Was the $200,000 purchase order entered after Mitsubishi said that they were stopping there? Yes. Mitsubishi, I believe, pulled the plug in early 2001, and that purchase order was issued on April 17, 2001. And also, after he discussed with Mr. Marshak, which is bankruptcy counsel, and obtained the direct knowledge that the company cannot possibly be profitable even after wiping all the debts. So at that point of time, when he discussed the payments, when he issued the purchase order, he know that that's not a truthful statement because the company has absolutely no ability to pay on that term. But the reason I mention the Griffin's case is because the Griffin's case went slightly further. It basically stands for the proposition that the overt misrepresentation is not necessary, even though in Griffin's court, the court did find there was a misrepresentation by the debtor, which is Felton. So that's why that's the first part of the non-dischargeability request is misrepresentation. The second part is a malicious injury, which we also cited a case, which is Petrelia versus, I don't know how to pronounce it, Gerisich. Again, it goes to the situation is when debtor owns this corporation, and so much consumer goods delivered to them at the eve of the closing, the financial statement shows the income for the second quarter of that corporation only about $26,000. So it's not impossible he does not know that that's a huge amount of merchandise, a couple hundred thousand dollars delivered at that time. And also, I think an important issue is under circumstances, who's responsible? Clearly, debtor's responsible. He owns 80 percent. His brother owns another 20 percent. He's the operating officer. He's the president of a company. And more importantly, he benefited from the delivery of goods because eventually he siphoned off $200,000, which more than half of it can be traced to the goods delivered by my client to his company. Well, you only win if you can prove that the company was an alter ego of the debtor. 80 percent of stock ownership and being an officer generally won't get you there. What else do you have? Okay. My suggestion is the method of control, because he controlled a corporation, and he benefited from the corporation conduct. I don't believe alter ego is really a necessary step in order to get there, because he can comply with all the formality requirement, but in the end, he siphoned out the money from the company. I think that's where it really comes, is what did he benefit, and whether he's entitled to benefit, because he happened to have a corporation, not just for himself to go out there to give me $200,000 of goods, I'm not going to pay you. What's your best case that that gives you a direct cause of action against him? Are you in between the two? Yes. I mean, if someone siphons off money from the company, the cause of action usually accrues to the company, not the third-party creditor. I think that's the reason I cited those two cases, and there are other cases also cited in that brief. It's the individual who's using a company. It's not necessarily the company's conduct. It's the individual who controls the company and who benefits from it. I think we have your argument in hand. Do you want to save some time for rebuttal? Yes, I do. Good morning, Your Honors. My name is William Byrd, and I'm here on behalf of John Amoroso, Jr., the appellee in this matter, and the defendant in the action below. Mr. Amoroso was the president of a corporation, Audio Wood Products. Audio Wood Products contracted to buy product from the appellant, ZTE. There was a two-day trial in the bankruptcy court on ZTE's complaint, and after that trial, the bankruptcy court made certain findings on the record and then subsequently entered written findings of fact and conclusions of law. There were 26 findings of fact entered by the bankruptcy court separately. On appeal, ZTE has only challenged two of those findings. I believe their number is 13 and 23. If we throw 13 and 23 out, the remaining findings by the bankruptcy court are sufficient to support its judgment. ZTE framed its case as an argument to pierce the corporate veil of Audio Wood and to hold Mr. Amoroso personally liable for the debt of Audio Wood. Now, because this was a bankruptcy proceeding, there's a dischargeability issue involved. And so their complaint was to bar discharge of the debt on the grounds that it was incurred through misrepresentation or fraud, which is 523A2 of the bankruptcy code, and on the grounds that it arose from willful and malicious injury to another or the property of another, which is Section 523A6 of the bankruptcy   Now, the bankruptcy court used that process to determine that a debt is nondischargeable. First, there must be the existence of a debt, an obligation owed by the debtor. Hence, ZTE's argument that the corporate veil should be pierced. The bankruptcy court did not find sufficient evidence to justify piercing the corporate veil, did not find that it would work an injustice not to pierce the corporate veil. But went further and said, but even if we did pierce the corporate veil, there was no fraud by Mr. Amoroso. At its heyday, Audio Wood Products had about 250 employees and did, I think it was, 17 million a year in business. There was a separate purchasing department that was headed up by a fellow named Tim Best. Mr. Amoroso's brother, Michael Amoroso, was the head of the Home Speaker Department, which was the department which used the product purchased from ZTE. Simply put, John Amoroso, Jr., the appellant here, had absolutely nothing to do with ZTE. He had no communications with them. He did not place the purchase orders. The final purchase order to which counsel referred, which was dated April 17th, if we look at that, we see that it says that the buyer is Tim Best, the purchasing agent for Audio Wood. Now, what's interesting to note, and both the bankruptcy appellate panel and the bankruptcy court noted, that although the last product was ordered in April, it was delivered in June of 2001. And after the date of the last delivery, there were, I believe it was, five more payments by Audio Wood on the debt to ZTE, totaling about $75,000. If we look at that window between the date of the last order, April, and the date of delivery, June, we see that in addition, there were four more payments after the final order was placed, totaling $50,000. And that's under tab E at page 72, is the schedule of payments. So, after the final order is placed, Audio Wood pays about $125,000 on the debt to ZTE. That hardly seems to be the conduct of an entity that intends to acquire a product with no intent to pay for it. Audio Wood's primary customer, I shouldn't say primary, but largest customer was Mitsubishi. And that represented, by March of 2001, about 50% of Audio Wood's business. And in March of 2001, Audio Wood learned that Mitsubishi was transferring all its cabinet work to Mexico. This caused immediate concern, because it's a significant loss of business. Did it necessarily mean the company was going to go out of business? No. At that point, the principals believed the company would survive. They immediately scaled down the operation. The Bankruptcy Court found that they took the steps that any prudent management would take to attempt to ensure the survival of the company. They conferred with Mr. Marshak in March 2001, because they saw that potentially there were going to be problems. But at that point, the company was still solvent. The balance sheet still showed about a million dollars in shareholders' equity as of May 2001, a month after the final order to ZTE. Now, the company did not survive. And in September 2001, they made the realization that we're not going to make it. And on the advice of counsel, the corporation did an assignment for benefit of creditors. I gather the corporate shell still exists. Pardon me, Your Honor? The corporate shell still exists of Audio Wood. Well, it's still there, yes, Your Honor. It still exists. So the idea was to keep the corporate shell, to retain corporate protection against suits, not go through bankruptcy or Chapter 7, and then to assign for the benefit of secured creditors, essentially? Well, not for secured creditors, Your Honor. All right. Audio Wood believed that it had a significant claim against Mitsubishi. Because Mitsubishi had represented to Audio Wood certain things that caused them to expand their operation, consolidate things here, and to expand in the hopes of getting new business. And they believed that they had a significant claim against Mitsubishi. And in fact, at one point, they had an attorney who was prepared to pursue that action on a contingency basis. Based on the advice of insolvency counsel, Mr. Marshak is a bankruptcy attorney of over 20 years' experience, has served as a panel trustee in the Central District since, I think, about 1985. The principles of Audio Wood conferred with him. He recommended an assignment for benefit of creditors rather than a Chapter 7, because he thought that would enhance the ability to pursue the claim against Mitsubishi. The assignment did not turn out well. Mr. Amoroso, when he did the assignment, was in hopes that he himself would be able to avoid bankruptcy. It didn't work out that way. The bottom line, Your Honors, is if we scour the record, there is no evidence of any misrepresentation by Mr. Amoroso. There is no evidence that he misused the corporation in any way. There is no evidence that he did anything other than use his best efforts to ensure the survival of Audio Wood products. It didn't work. ZTE was hurt, and it didn't get paid. Mr. Amoroso was hurt, and he wound up in bankruptcy. What other creditors? Who were the other major creditors of the corporation at the time that the assignment for the benefit of creditors was executed? There was a significant secured creditor. There was bank financing, Your Honor, and that's not included in the excerpts of the record. So was ZTE really the only significant unsecured creditor? Oh, no, Your Honor. In fact, in the scheme of things, it was small. The bank was the largest, and it was actually the bank. Mr. Amoroso had personally guaranteed that debt, and they were pursuing him, and that was what really precipitated him filing bankruptcy, is being pursued on personal guarantees. There was also leased equipment for which he had executed personal guarantees. He had not executed any personal guarantees for the trade vendors such as ZTE. But just in closing, I want to touch briefly on the Felton v. Griffin case, which counsel alluded to. In Felton, there were active misrepresentations, false statements by the debtor. And all the court held in Felton was that based on an indirect benefit theory, that you can't hide, make false representations to somebody and say, oh, but it didn't benefit me. It benefited the corporation and I'm separate. And that makes perfect sense. In a way, it would also probably support a claim to pierce the corporate veil. It's using the corporation as a device to commit fraud. There's no evidence that that happened here. As far as Petrelia v. Jerzich, which is the 523A6 case, willful and malicious injury to the property of another, ZTE has identified no property interest whatsoever of its that Mr. Amoroso harmed. The Supreme Court has held that in order to state a claim for willful and malicious injury, the willful prong requires there to be an actual intent to injure. There's no evidence whatsoever that Mr. Amoroso did anything with the intent to injure ZTE. In Petrelia v. Jerzich, an employer willfully and intentionally failed to pay salary to an employee even though he had the money to do so. This Court noted that under California law, wages are afforded special treatment, and under the Labor Code, a willful failure to pay wages when able to do so is a misdemeanor. And based on that, the Court found that the willful failure to pay wages when you were able to do so constituted willful and malicious injury under 523A6. It's totally unrelated and distinguishable from the facts in this case, but there's absolutely no evidence that Mr. Amoroso did anything to harm ZTE or any property interest that he had. Roberts. Thank you, counsel. Thank you, Your Honor. May I briefly address a couple of points you just mentioned? One is on the payment issue. If we look at the payment schedule, the $20,000 is all shipped after the last purchase order, April 17, 2001, and the last shipment is on June 29, 2001. At that time, our understanding is it's become a Ponzi game. I pay you a little bit, give me another container or two, until the container stops, so the payment shortly after also stops. As far as the assignment to the benefit of creditors, the time sequence is company went to assignment first, debtor filed bankruptcy later on. Assignment has a lot of benefits because it gives the creditor impression that somebody has reorganized this. Actually, the transcript shows it's totally untrue. Basically, the company pays this person doing assignment $13,000. He sent out a letter. That's the end of it. There's none of the things which provided in the bankruptcy quota ever take place. You could have filed an involuntary bankruptcy at that point. They could have filed, but again, at that time, apparently nobody did. And also, based on my understanding, is most creditors are not sophisticated enough. Once they receive the assignment notice, they have the impression something is happening. But actually, that's only an illusion because nothing is really happening. But an assignment for the benefit of creditors is a perfectly legal way of dealing with corporate debts. That's true. But on the other hand, it benefits this particular debtor because assignment, they will not come to go after him. See, my opposing counsel did not address this $200,000 loan he got from the company. I think that by itself is a misuse of a corporation, if not out of ego, because where the money coming from? The money actually coming from is from, like I said, from the merchandise we deliver to him, and he sell them without any invoice, without any purchase order, and the money goes into his pocket. Then eventually, he filed bankruptcy and listed it on his schedule. He could have returned the merchandise because he's the president of the company. He controls the merchandise, but he did not do it. Just like in the Petrelia case, he could have paid the person wages, and he could have returned the goods back to us, but he did not do it. But he liquidated them, put into his own pocket. So I think that's the basis for we asking for the non-dischargeability based on 523A6. Okay. Further questions? Thank you, counsel. The case just heard will be submitted for decision. And we'll proceed to the last case on the oral argument calendar for this morning, which is Santee v. Charter Oak Unified School District.
judges: Canby, Thomas, Conlon